## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

J.D. and B.D., *parents and next friends of* K.D.,   )
                                       )
        Plaintiffs,                      )
                                       )
        v.                           )      CAUSE NO.: 2:10-CV-508-TLS
                                       )
CROWN POINT SCHOOL CORPORATION,   )
                                       )
        Defendant.                   )

## OPINION AND ORDER

This case comes before the Court through a Complaint [ECF No. 1] brought by K.D., by and through his parents and next friends, J.D. and B.D. (collectively, the Plaintiffs), against the Crown Point School Corporation. The Plaintiffs allege that the Defendant violated K.D.'s rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and corresponding state special education laws, to a free appropriate public education (FAPE). The Plaintiffs allege that the Defendant failed to comply with the IDEA both procedurally and substantively, and seek reimbursement for the costs of enrolling K.D. in a private school.

The matters before the Court are a Motion for Summary Judgment [ECF No. 16] filed by the Plaintiffs on May 27, 2011, along with a corresponding Brief in Support [ECF No. 17]; a Cross Motion for Summary Judgment [ECF No. 24] filed by the Defendant on July 1, along with a corresponding Brief in Opposition and in Support [ECF No. 25]; Plaintiffs' Reply [ECF No. 27] filed on July 15; and Defendant's Reply [ECF No. 28] filed on July 22. The parties have agreed this case is appropriate for disposition through summary judgment, and neither party has asked the Court to supplement the record. Accordingly, this Opinion and Order addresses all matters before the Court.

# FACTUAL BACKGROUND

## A.     Evaluations and IEPs Before April 2008[1]

K.D. was born on September 4, 1998. He resides with his parents in Crown Point, Indiana, and during the 2008–2009 and 2009–2010 school years he attended Jerry Ross Elementary School in Crown Point.

Indiana's First Steps program provides early intervention services to children with disabilities who are younger than three years old. K.D. was first evaluated by First Steps on August 28, 2001. The evaluation showed him to be eligible for special educational services with a primary diagnosis of hearing impairment and no secondary diagnosis. (R. at 1312.) The Defendant has provided K.D. special education services since that time. K.D. was reevaluated on February 7, 2006, and given a primary diagnosis of hearing impairment with a secondary diagnosis of communication disorder. A triennial evaluation would have been due on February 7, 2009. (*Id.*) The February 2006 evaluation indicated K.D. had low average "overall ability," and did not suggest the presence of a learning disability. (R. at 1316.) In April 2006, at the end of K.D.'s first grade year, the Defendant instituted an Individualized Education Program (IEP[2])

---

[1]Under the IDEA, "[a] parent . . . shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). The Defendant argues only those events within two years of the parents' April 26, 2010, request for a due process hearing are relevant to the Court's analysis. The Court believes events occurring before April 26, 2008, will be relevant to an analysis of when and whether further evaluation of K.D. was appropriate, and accordingly, the Court will summarize these pre-April 2008 facts.

[2]An IEP is developed in Indiana through a case conference committee process. An IEP meeting consists of the case conference committee and the parent or guardian. The purpose of the meeting is to interpret data and results from educational evaluation tests of the child, to determine appropriate placement options for the child that provide the least restrictive environment for the child, and to determine necessary related services that the child is to receive.

aimed at addressing K.D.'s hearing impairment and communication disorder. (R. at 1329.)

Because his parents perceived him to be struggling in the second grade, they requested testing for K.D. in February 2007. A Multidisciplinary Team from the Indiana School for the Deaf evaluated K.D. and found he was reading at the "beginning second grade level," placing him "at the low-average-to-average range for reading." (R. at 443.) The February 2007 evaluation also noted K.D.'s problems with focusing and suggested that his parents "may wish to seek a referral for a medical evaluation of possible Attention Deficit Hyperactivity Disorder, as [K.D.'s] limited attention, poor impulse control, and high activity level are *not related to his hearing loss*." (*Id.* (emphasis added).)

In November 2007, during the first semester of K.D.'s third grade year, K.D.'s parents requested a meeting of the IEP case conference committee (CCC). During that conference, K.D.'s speech therapist stated that her evaluation had revealed K.D.'s weaknesses in "expressive language, grammar, auditory memory, and vocabulary." (R. at 328.) The CCC discussed strategies for pre-teaching vocabulary, and informed K.D.'s mother that there would be no changes to the IEP. (*Id.*) In January 2008, an educational consultant from the Indiana School for the Deaf conducted an in-school observation of K.D. She noted his restlessness during class, but observed that his restless behavior "was similar to other students in the classroom." (R. at 461.)

**B.    IEP Development from April 2008–April 2010**

On April 2, 2008, near the end of K.D.'s third grade year, the CCC met to discuss K.D.'s progress and update his IEP. At the meeting, K.D.'s mother requested that he be reevaluated. (R. at 334.) Summer school for the summer of 2008 was discussed as an option, but K.D.'s mother

did not feel that the prior year's summer school had been helpful to K.D. The April 2008 IEP

indicated that K.D. had average intelligence, difficulty with grammar and vocabulary, and

difficulty staying focused. (R. at 335.) The IEP noted no problems with behavior, and that a

behavioral intervention plan (BIP) was not necessary. (R. at 335, 348.) The April 2008 IEP also

indicated that K.D. was reading at the "2.3 level[]," which the IEP described as "marked

improvement in reading." (R. at 336.) The April 2008 IEP set four goals, with concomitant

benchmarks[3] intended to help gauge goal completion. The April 2008 IEP goals were as follows:

> [1] [K.D.] will accurately produce the targeted sounds (s, z, sh) during
> conversational exchanges with a maximum of 3 errors.
> [2] [K.D.] will formulate sentences of increasing grammatical complexity and use
> age appropriate language with 80% accuracy.
> [3] [K.D.] will demonstrate comprehension and use of language in the area of
> semantics with 90% performance.
> [4] Given information at instructional level, [K.D.] will ask thoughtful questions
> and respond orally and in writing to relevant questions with appropriate
> elaboration in 4 out of 5 attempts.

(R. at 338, 340, 343, 345.) To address K.D.'s hearing impairment, the April 2008 IEP called for

120 minutes per month of hearing impairment services from the teacher of record and 2.5 hours

per week from the special education teacher.[4] To address K.D.'s communication disorder, the

April 2008 IEP called for 120 minutes per month of speech services. (R. at 347.)

A May 2008 speech evaluation by K.D.'s speech therapist noted that K.D. was

"expect[ed] . . . to make one year of growth in skills over the period of one year. This standard

---

[3]The April 2008 IEP benchmarks included quantitative standards to measure goal completion,
such as answering questions with "80% accuracy," and completing exercises correctly in "4 of 5 trials for
3 consecutive sessions." (R. at 340–41, 343, 345.)

[4]In the IEPs, the special education teacher is referred to as the LRE teacher. LRE is a legal
concept under the IDEA, requiring that a student receive educational instruction in the least restrictive
environment (LRE).

should be used as a benchmark to measure [K.D.]'s longitudinal progress." (R. at 467.) A June

2008 evaluation of K.D. at the Indiana School for the Deaf noted that K.D. was "often

distracted" and required frequent redirection. (R. at 473.) The June 2008 evaluation noted that

K.D.'s written English skills were average, but cautioned that:

> an analysis of his skills reveals several concerns about his skills that are likely to
> significantly impact his education as his written English expectations increase.
> *His writing demonstrates characteristics of a learning disability that is*
> *educationally significant.* As [K.D.]'s written demands increase in school, he will
> need modifications for notetaking, longer written assignments, copying
> information, and his spelling.

(R. at 474 (emphasis added).) The June 2008 evaluation included psychological testing, which

revealed that "[K.D.]'s rate of learning in reading comprehension is slower than was noted in the

previous testing with lower standard scores in word identification, reading fluency, and reading

vocabulary suggesting he needs more support in these areas." (R. at 476.) The June 2008

evaluation also noted that K.D.'s reading comprehension was at a middle second grade level, and

his math calculation skills were appropriate for his age and grade, but that his "attention issues"

were affecting his retention of information. (*Id.*) The June 2008 evaluation recommended

discussion of retention in the third grade because in the fourth grade "most subjects are

language-based and [K.D.] may not have an adequate foundation to handle language-based

academics at a level commensurate with his cognitive abilities." (R. at 477.) The June 2008

evaluation added that "[K.D.] is still learning to read and is not ready to read to learn." (*Id.*)

The CCC met on October 10, 2008, and its session was continued on November 7, 2008.

K.D.'s parents recorded and transcribed the November meeting. In October/November 2008,

K.D. was in the first semester of his fourth grade year. At the November CCC meeting, one of

K.D.'s special education teachers noted that he was still testing at a beginning second grade

reading level. (R. at 875.) She additionally noted that part of K.D.'s problem was "focusing and attention," (R. at 876), and the teacher of record stated that "the attention thing is a very, very big problem." (R. at 881.) K.D.'s mother expressed concern that K.D. lacked the skills to be on task, and suggested a systematic, sequential reading program, to which school officials declined to commit (R. at 878–79, 884), though later testimony indicated the special education teacher did begin implementing that program in November 2008. (R. at 922.) K.D.'s parents argued that he was falling behind his peers, and that his progress should not differ from others since his cognition was normal. The district director argued that he was making adequate progress, and also noted that "focus is a lot of the problem." (R. at 891, 897.) His special education teacher emphasized again that she was "trying to get him organized and stay organized." (R. at 908.) The CCC did not implement changes to the April 2008 IEP as a result of the October and November 2008 meetings.

After the October/November 2008 meetings, K.D.'s teacher of record communicated with his mother about adding IEP goals not related to hearing impairment, and stated in an email to another teacher: "I don't believe his issues are hearing related." (R. at 1027, 1035.) She stated further: "I don't think mom understands that if her son justs [sic] gets organized and focused that he would not need as much assistance as she believes." (R. at 1043.)

The Defendant attempted to schedule a new CCC meeting in March 2009, but due to scheduling conflicts, no meeting was set until April 1, 2009, the date upon which the current IEP expired. K.D.'s mother participated in that meeting by telephone, and requested another meeting so she could attend in person. Another CCC meeting therefore convened on April 24, 2009, which K.D.'s parents again recorded and transcribed.

The April 2009 IEP characterized K.D.'s ability as "within the low average range," and asserted that his "immaturity will affect his ability to stay organized and on task." (R. at 362.) The IEP again noted no behavior problems, and that a behavioral intervention plan (BIP) was not necessary. (R. at 362, 374, 385.) The April 2009 IEP also noted that K.D. failed to pass the English and the Math portions of the Indiana Statewide Testing for Educational Progress (ISTEP) test. (R. at 363.) The April 2009 IEP included goals which were similar to the goals from K.D.'s April 2008 IEP:

> [1] [K.D] will accurately produce the targeted sounds (s, z, sh) during conversational exchanges with a maximum of 3 errors.
> [2] [K.D.] will demonstrate comprehension and use of language in the area of semantics with 80% performance.
> [3] Given and [sic] topic at grade level, [K.D.] will write using Standard English conventions with 75% accuracy.
> [4] Given material at his instructional level, [K.D.] will increase his reading fluency by reading a selection with 75% accuracy.

(R. at 365, 367, 369, 371.) The April 2009 IEP goals also included benchmarks[5] similar to those from April 2008, designed to gauge goal progress. To address K.D.'s hearing impairment, the April 2009 IEP included 60 hours per month in hearing impairment services from the teacher of record, and 2.5 hours per week from the special education teacher. To address K.D.'s communication disorder, the April 2009 IEP included 90 minutes per month of speech services. (R. at 373.)

During the April 24, 2009, CCC meeting, the teacher of record stated that although it was time for K.D.'s triennial evaluation, she recommended waiving the testing since no services were being added or taken away. (R. at 361, 381.) K.D.'s mother expressed her desire to have K.D.

---

[5]The April 2009 IEP benchmarks again included quantitative standards to measure goal completion, such as answering questions with "75% accuracy," and completing exercises correctly in "4 of 5 trials for 3 consecutive sessions." (R. at 365, 367, 369–72.)

tested on a yearly basis. (R. at 381, 912.) The teacher of record acknowledged that writing and reading fluency were issues for K.D., but asserted that the current testing regime—including ISTEP, Acuity, and Star Reading tests—was sufficient to measure K.D.'s progress. (R. at 912.) K.D.'s mother stated her concerns that K.D. was not making adequate progress and was reading at a 2.7 grade level in his second semester of the fourth grade. (R. at 922.) She requested a private tutor for K.D. over the summer to prevent regression, which the district director declined to provide. (*Id.*) The district director reiterated the Defendant's position that one-on-one tutoring was not needed for K.D. because he was making progress. (R. at 923.) K.D.'s mother reiterated her position that one-on-one remediation was necessary for K.D. to catch up to his peers (R. at 926), refused to sign the IEP, and requested mediation. (R. at 929.) As a result of the April 24, 2009, CCC meeting—and at the request of K.D.'s mother—an additional goal was adopted: "[5] [K.D.] will increase cognitive memory skills for information provided with 80% performance." (R. at 382, 386.) This IEP goal also included benchmarks with qualitative measures of performance. (R. at 382.)

In early August 2009, the principal of the Jerry Ross Elementary School notified K.D.'s parents that K.D. would be retained in the fourth grade for the 2009–2010 school year. (R. at 388.) In September 2009, his special education teacher informed K.D.'s mother that he was "making mistakes [in reading] that he hasn't made in a long time." (R. at 1090.) Further, he remained disorganized. (R. at 1095–97, 1109.)

Because of continuing concerns about K.D.'s progress, his parents had him evaluated by Dr. Shana Erenberg in October 2009. Dr. Erenberg administered a variety of tests on K.D. and determined him to have average cognitive ability, but opined that his difficulties organizing

expressive language relate more to a processing deficit than to hearing impairment. (R. at 491.) She noted a "significant weakness" in "cognitive fluency" (R. at 493), and stated that his processing defects "necessitate a highly specialized, multisensory approach to remediation across all academic areas." (R. at 495.) Noting regression in K.D.'s reading scores, she opined that "[K.D.]'s reading disabilities are significant enough to be classified as Dyslexia, a rare, severe, complex subset of reading and written language disorders" (R. at 498), and recommended "a visually-based, highly-structured, multisensory reading intervention to address his severe decoding deficits." (R. at 499.) She also noted that "[s]ocial skills are an area of concern," citing K.D.'s mother's worries about his time spent with peers and reports that K.D. was bullied at school. (R. at 498.) Dr. Erenberg addressed K.D.'s weaknesses in writing and spelling (R. at 500–01), and although she noted his relative strength in mathematics, she recommended "multisensory instruction in math computation." (R. at 502.) Dr. Erenberg concluded that K.D.'s profile reflects "severe learning disabilities" in addition to his hearing impairment. While noting that "a primary diagnosis of hearing impairment typically disqualifies a learning disabilities categorization," she maintained that "[K.D.]'s profile indicates that both issues are adversely affecting his academic progress." (R. at 506.) Dr. Erenberg recommended that K.D.'s IEP be amended to include goals addressing his learning disability, that he be transferred to a "highly structured educational environment such as Hyde Park Day School" or another school providing "multisensory instruction in all academic areas" (R. at 506), and made specific recommendations of multiple tools and techniques to address reading, listening, writing, spelling, and executive functioning. (R. at 507–12.) K.D.'s parents sent the Defendant a copy of Dr. Erenberg's report on January 4, 2010. (R. at 1128–29.) In February 2010, K.D.'s parents

arranged to have Dr. Erenberg attend a CCC meeting (R. at 212), but the parents do not appear to have been in attendance, and no transcript of that meeting is provided in the record.

The CCC met on March 15, 2010—a hearing that was recorded and transcribed by K.D.'s parents. At the conference, K.D.'s mother asked that in accordance with Dr. Erenberg's recommendations K.D. be classified as having a severe learning disability, that he receive multisensory education, and that he be considered for placement in the Hyde Park Day School. (R. at 970–74.) Representatives of the Defendant maintained that K.D. was not eligible for a diagnosis of a severe learning disability in Indiana because of his hearing impairment. Further, they maintained that K.D. was already receiving multisensory education, and that placement at Hyde Park Day School would not be an appropriate placement given his lack of a severe learning disability diagnosis and the progress he was making. (*Id.*) The March 2010 IEP contained goals as follows:

> [1] [K.D.] will produce, identify, and distinguish between /s/, /sh/, and /z/ in all positions of words with 80% accuracy across three consecutive charting sessions.
> [2] [K.D.] will improve overall receptive and expressive language skills by demonstrating understanding/use of semantics, memory, and comprehension with 80% accuracy across three consecutive charting sessions.
> [3] [K.D] will increase his understanding of nonfiction and literal material by identifying and explaining the use of figurative language and the main idea or theme using texts at his instructional level with 75% accuracy.
> [4] Given information at grade level, [K.D.] will increase his problem solving abilities by explaining orally and in writing how he arrived at an answer with 75% accuracy.
> [5] Given information at grade level, [K.D] will respond to information presented orally by answering question appropriately and asking questions that seek information not already discussed in 4 out of 5 attempts.
> [6] Given information at grade level, [K.D.] will write two paragraphs on a topic with no more than 5 errors.

(R. at 411, 413, 415, 417, 419, 421.) These IEP goals again included benchmarks.[6] The IEP once again noted no behavior problems, and indicated that a BIP was not necessary. (R. at 408, 424.) The March 2010 IEP added a paraprofessional to assist with the goals in reading comprehension (Goal 3 above), problem solving (Goal 4 above), and writing (Goal 6 above). (R. at 415–18, 21.) To address the parents' concerns about a possible severe learning disability, the March 2010 IEP added 6 hours per week with the special education teacher instead of 2.5 hours per week (R. at 423), and placed K.D. in the resource room instead of the general education classroom for work on his reading comprehension goal. (R. at 415.) The March 2010 IEP additionally called for 60 minutes per month of hearing impairment services from the teacher of record, and 120 minutes per month of speech services, up from 90 minutes per month in the April 2009 IEP. (R. at 423.) K.D.'s parents did not sign the March 2010 IEP, and it was never put into place since his parents demanded a due process hearing in April 2010, and unilaterally placed K.D. in the Hyde Park Day School at the beginning of the 2010–2011 school year.

The record indicates that K.D. made academic progress over the course of the years in question. His fall 2008 ISTEP scores were 354 on the English/Language Arts portion (75 points below passing) and 407 on the Mathematics portion (8 points below passing). (R. at 2174–75.) His spring 2009 ISTEP scores were 381 on the English/Language Arts portion (56 points below passing) and 456 on the Mathematics portion (11 points above passing). (R. at 2176–77.) His spring 2010 ISTEP scores were 445 on the English/Language Arts portion (8 points above passing) and 473 on the Mathematics portion (28 points above passing). (R. at 2208–09.) K.D.'s

---

[6]The March 2010 IEP benchmarks continued to include quantitative standards to measure goal completion, such as completing exercises correctly in "8/10 opportunities," and answering questions correctly in "4 out of 5 attempts." (R. at 411–21.)

results on star math and star reading tests from September 2007 to May 2010 indicate overall progress. (R. at 2206–07.) His Acuity test scores on math, language arts, and science increased from September 2008 to February 2010. (R. at 2197–2205, 2408.) K.D.'s accelerated reader scores show a steady increase in his book reading level from September 2009 to April 2010. (R. at 2452.) His teachers testified that his writing skills have also improved over time. (R. at 1400, 3002, 3630, 3880–81, 3890–91.) His scores on the Woodcock-Johnson III test indicated no significant improvement, however. (R. at 475–76, 4933.)

## PROCEDURAL BACKGROUND

On April 26, 2010, the Plaintiffs filed a request for a due process hearing. (R. at 28–31.) On April 27, the Superintendent of Public Instruction, Indiana Department of Education, appointed Dr. James Jacobs the independent hearing officer (IHO) for the due process hearing—hearing #052-2010. Prior to the hearing, the Defendant requested an opportunity to conduct an educational evaluation of K.D. The Plaintiffs objected on the grounds that the Defendant had denied the parents' requests for such an evaluation on multiple occasions in the past, and should not be allowed to conduct such an evaluation just prior to the hearing. The IHO ordered that the Defendant conduct an evaluation, finding as follows:

> 1. The School has not conducted a thorough educational evaluation in excess of four years. Any other evaluations conducted of the Student were conducted by the Indiana School for the Deaf and were for the purpose of gaining insight regarding the Student's academic skills.
> 2. The Student has not been evaluated by the School for the possibility of having a Specific Learning Disability at any time.
> 3. The issue of whether the Student has, or does not have, a Specific Learning Disability is in dispute.
> 4. The IHO has the authority . . . to grant Respondent's request to perform an educational evaluation.

(R. at 225.) The Defendant conducted the educational evaluation in May 2010, before the due process hearing, but the school's psychologist did not determine that K.D. had a specific learning disability (SLD). (R. at 1548.) Also prior to the hearing, the parties revised and expanded the list of issues to be decided by the IHO at the due process hearing. (*See* R. at 280–81.) The issues were: whether K.D.'s IEPs dated November 6, 2008, April 1, 2009, April 24, 2009, and March 15, 2010, were reasonably calculated to provide meaningful educational benefit (issues 1–4); whether the Defendant failed to implement K.D.'s IEPs dated November 6, 2008, April 1, 2009, April 24, 2009, and March 15, 2010, as written (issues 5–8); whether the Defendant failed to consider suggestions offered by outside providers when developing K.D.'s IEPs dated November 6, 2008, April 1, 2009, April 24, 2009, and March 15, 2010 (issues 9–12); whether the Defendant failed to consider suggestions provided by K.D.'s parents when developing K.D.'s IEPs dated November 6, 2008, April 1, 2009, April 24, 2009, and March 15, 2010 (issues 13–16); whether the Defendant,

> by failure to: 1) provide any combination of materials listed in any of [K.D.]'s IEPs, 2) consider input from outside providers or [K.D.]'s parents, when constructing any of [K.D.]'s IEPs, or 3) provide any services contained in [K.D.]'s IEPs as listed above, den[ied] [K.D.] a free appropriate public education (FAPE)

(R. at 5581) (issue 17); and whether Hyde Park Day School was an appropriate placement for K.D. (issue 18). Notably, despite the IHO's earlier finding that the issue of whether K.D. had an SLD was in dispute, it was not one of the issues to be decided at the hearing, and the IHO made no finding on it.

The IHO conducted the hearing at the Jerry Ross Elementary School, Crown Point, Indiana, on June 7–10, 14, and 17–18, 2010. On July 16, 2010, the IHO issued his decision,

wherein he held that K.D.'s IEPs were reasonably calculated to provide educational benefit, that the IEPs were implemented as written, that the IEP committee considered suggestions of the outside providers and K.D.'s parents, that K.D. actually received meaningful and measurable benefit from the services provided, and that K.D. was not denied a FAPE. (R. at 5575–5637.) Because the IHO determined that K.D. was not denied a FAPE, he determined that the issue of whether the Hyde Park Day School was an appropriate placement was moot. (R. at 5633.) The IHO concluded by ordering that the March 15, 2010, IEP be implemented, that K.D. attend the fifth grade at the Jerry Ross Elementary School for the 2010–2011 school year, and that the IEP committee continue to monitor and evaluate K.D.'s eligibility for special education as a student with an SLD. (R. at 5634.) The IHO issued an Order of Clarification on July 31, 2010, correcting two minor errors.

On September 30, 2010, the Plaintiffs appealed to the Indiana Board of Special Education Appeals (BSEA).[7] The BSEA reviewed the IHO's findings and issued a final decision on December 20, amending many of the IHO's findings of fact, revising and modifying some of the IHO's orders,[8] finding no bias on the part of the IHO, and upholding the IHO's conclusions of law and decision. (R. at 5154–5162.)

On December 29, 2010, the Plaintiffs filed their Complaint [ECF No. 1], seeking declaratory relief, compensation for past and future private school costs, and attorney's fees. On February 21, 2011, the Defendant filed an Answer [ECF No. 8], and cross motions for summary judgment followed.

[7]The Plaintiffs received from the BSEA two extensions of time in which to file.

[8]The BSEA revised and modified the IHO's orders based on a recognition that K.D. was no longer enrolled in a public school as of December 2010.

## STANDARD OF REVIEW UNDER THE IDEA

"Any party aggrieved by the findings and decision" of a hearing officer or state agency "shall have the right to bring a civil action with respect to the complaint . . .  in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In any action brought in a federal court under § 1415(i), the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and shall, basing its decision on the preponderance of the evidence, grant such relief as it determines appropriate. *Id.* § 1415(i)(2)(B). Because of the unique procedural posture of cases under the IDEA—in which a federal court is asked to review the decision of the state educational administrative body—summary judgment has been deemed the appropriate mechanism for bringing the issues and claims before the court for decision, and is "perhaps better described as judgment on the record." *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002); *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) ("[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.") (quotation marks omitted). Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence. *Bd. of Educ. of LaGrange Sch. Dist. No. 105 v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999).

However, a district court "must confer due weight to the final decisions of the state administrators and cannot substitute its own notions of sound educational policy for those of the school authorities." *Butler v. Evans*, 225 F.3d 887, 892 (7th Cir. 2000) (citing cases).

> [A] district court must independently determine whether the requirements of the Act have been satisfied. In developing this standard, Congress specifically

rejected language which would have made state administrative findings
conclusive if supported by substantial evidence. . . . However, because courts do
not have special expertise in the area of educational policy, they must give "due
weight" to the results of the administrative decisions and should not substitute
"their own notions of sound educational policy for those of the school authorities
which they review."

*Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. Bd. of Educ.*, 41 F.3d 1162,

1166 (7th Cir. 1994) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 206 (1982)); *see also Heather S.*, 125 F.3d at 1052–53.

The "due weight" that a court must give to the hearings below is not to the testimony of

witnesses or to the evidence—both of which must be independently evaluated—but to the

decisions of the hearing officers. *Heather S.*, 125 F.3d at 1053. Additionally, the amount of

deference given to the hearing officer's conclusions increases when the hearing officer's findings

are "thorough and complete." *Nein v. Greater Clark Cnty. Sch. Corp.*, 95 F. Supp. 2d 961, 965

(S.D. Ind. 2000) (quoting *Adams v. Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999)).[9]

Where no evidence is put forth beyond what was presented to the IHO and the BSEA, the

court must provide "the usual deference that reviewing courts owe agencies when judicial review

is limited to the administrative record." *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th

Cir. 2002). This deference calls for a clear error—or substantial evidence—review. *M.B. ex rel.*

*Berns v. Hamilton Se. Sch.*, No. 10-3096, 2011 WL 6644068, at *7, — F.3d — (7th Cir. Dec. 22,

2011). *See also Alex. R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375

F.3d 603, 612 (7th Cir. 2004) ("where the district court does not take new evidence and relies

---

[9]Further, as the Defendant urges, the Fourth Circuit has suggested the amount of deference to the
IHO's conclusions also increases when the IHO and the reviewing officer agree. *Combs v. Sch. Bd. of
Rockingham Cnty.*, 15 F.3d 357, 351 (4th Cir. 1994).

solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'") (quoting *Wis. Dells*, 295 F.3d at 675). Furthermore, "[w]here there are conflicting decisions on an issue between the two levels of a state administrative review, federal courts are required to defer to the final decision . . . of the state authorities," *LaGrange Sch. Dist.*, 184 F.3d at 915, in this case, the BSEA. *See also Heather S.*, 125 F.3d at 1053–54 (approving of deferral to the final state decision when that decision "reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings"). Finally, the party challenging the decision or findings of the state educational agency bears the burden of proof. *Alex R.*, 375 F.3d at 611; *LaGrange Sch. Dist.*, 184 F.3d at 915; *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Ill. State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir. 1991).

## OVERVIEW OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

The Court will begin with a basic overview of the purposes and requirements of the IDEA.

### A.    Free Appropriate Education (FAPE) and Individualized Education Plan (IEP)

To meet the IDEA's requirements, a school district must provide each disabled student with a free appropriate public education (FAPE) tailored to the child's individual needs. *See* 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). A FAPE is an education "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188–89 (1982) (quotation marks omitted). The school district, however, is required to provide "an appropriate education, not the

best possible education." *Heather S.*, 125 F.3d at 1057.

A particular child's FAPE is defined by the Individualized Education Plan (IEP), which is "a written statement that maps out how a school district will provide an IDEA-compliant education." *Alex R.*, 375 F.3d at 606. The IEP is developed through a case conference process with the input of parents and educators. 20 U.S.C. §§ 1401(14), 1414(d); *Roy v. Valparaiso Cmty. Sch.*, 951 F. Supp. 1370, 1372 (N.D. Ind. 1997). The IEP must be tailored to the unique needs of the disabled student. *See* 20 U.S.C. § 1414(d).

**B.     Due Process**

The IDEA establishes a system of procedural protections to ensure that parents, teachers, and local education agencies work together to provide an appropriate education for children with disabilities. *Powers v. Ind. Dep't of Educ., Div. of Special Educ.*, 61 F.3d 552, 553 (7th Cir. 1995). Among the procedural safeguards provided in the IDEA are the right of the parents to written notice whenever a local, intermediate, or state educational agency proposes or refuses to propose a change in the child's educational placement, and the right to present a complaint regarding a child's educational placement. 20 U.S.C. § 1415(b).

Section 1415 also provides for a hearing process to challenge the adequacy of the IEP when informal procedures have failed. Whenever a complaint has been received pursuant to § 1415, the complaining parent has an opportunity for "an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." *Id.* § 1415(f)(1). Any party aggrieved by the findings and decision of a local educational agency may appeal to the State

educational agency. *Id.* § 1415(g). In April 2010 in Indiana, that State agency was the Board of Special Education Appeals (BSEA).[10]

**C.      Analysis of a FAPE**

The analysis of whether a FAPE has been provided as required under the IDEA is twofold, requiring a court to determine: (1) whether the state has complied with the IDEA's administrative procedures; and (2) whether the IEP is reasonably calculated to provide some educational benefit to the child. *See Rowley*, 458 U.S. at 206–07. Under the first *Rowley* prong, a denial of procedural rights does not automatically violate the IDEA's requirements for a FAPE. Instead, for a procedural violation to deny a FAPE, the denial must adversely impact the parents' participation or the student's education so as to result in a loss of educational opportunity. *Berns*, 2011 WL 6644068, at *8 ("[P]rocedural defects do not necessarily indicate that a child has been denied a free appropriate public education; only those defects that 'result in the loss of educational opportunity' deny a child a FAPE.") (quoting *Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007)); 20 U.S.C. § 1415(f)(3)(E)(ii). Under the second *Rowley* prong, an IEP is substantively adequate so long as it responds to "all significant facets of the student's disability, both academic and behavioral." *Alex R.*, 375 F.3d at 613. In other words, to be substantively appropriate, an IEP must be "likely to produce progress, not regression or trivial educational advancement." *Id.* at 615 (quotation marks omitted). *Cf. Nein*, 95 F. Supp. 2d at 975 ("merely trivial or minimal progress is not sufficient").

---

[10]The BSEA has since been dissolved, and now parties disagreeing with the IHO's decision in Indiana must file a petition for court review. *See* 511 Ind. Admin. Code 7-45-9(a).

## ISSUES PRESENTED FOR REVIEW

In their Complaint, the Plaintiffs allege that the Defendant violated the IDEA—both procedurally and substantively—as follows:

(1)     The Defendant failed to identify K.D. as a student with a learning disability and attention deficit disorder because the Defendant failed to appropriately evaluate K.D.

(2)     The Defendant failed to allow K.D.'s parents meaningful participation at case conference committee meetings.

(3)     The Defendant failed to offer appropriate services to K.D. from May 2008 onward, and failed to develop individualized education programs reasonably calculated to confer meaningful educational benefit on K.D.

(4)     The Defendant failed to offer appropriate compensatory services to K.D.

(Compl. ¶ 19, ECF No. 1.) Further, the Plaintiffs allege that:

(5)     The IHO and the BSEA wrongly determined that the Defendant provided K.D. with a FAPE.

(*Id.* ¶ 20.) The parties present the following arguments in their briefs on the cross motions for summary judgment:

### A.     Procedural Failure to Identify/Evaluate

The Plaintiffs complain that the Defendant did not evaluate K.D. in accordance with 20 U.S.C. § 1412(a)(3)(A), which requires the State to ensure that "[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." Specifically, the

Plaintiffs argue the Defendant had many opportunities to observe K.D.'s learning disability symptoms, but failed to assess K.D. in accordance with 20 U.S.C. § 1414(b), which requires that children with disabilities be "assessed in all areas of suspected disability." Prior to the due process hearing, the IHO found that the Defendant "has not conducted a thorough educational evaluation [of K.D.] in excess of four years," that K.D. "has not been evaluated by the [Defendant] for the possibility of having a Specific Learning Disability at any time," and that "[t]he issue of whether [K.D.] has, or does not have, a Specific Learning Disability is in dispute." (R. at 225.) Accordingly, the IHO ordered that K.D. be evaluated prior to the due process hearing. (*Id.*) K.D. was evaluated in May 2010, and the evaluator did not find that he had a Specific Learning Disability (SLD), though the evaluator did note a suspicion that "weaknesses in processing speed . . . are a contributing factor in [K.D.'s] learning difficulties." (R. at 1548.)

The Defendant argues, first, that the issue of whether K.D. has a learning disability was waived because it was not raised at the due process hearing itself[11] or before the BSEA. The Defendant further argues that even if the issue was not waived, any procedural failure to properly evaluate K.D. did not have the substantive effect of denial of a FAPE because K.D.'s IEPs were tailored to meet his individual educational needs and likely to produce meaningful educational benefit. Because the IHO did not consider the question, the BSEA also made no finding on the issue of whether the Defendant failed to properly evaluate K.D.

**B.      Procedural Failure to Allow for Meaningful Parental Participation**

---

[11]Although the IHO noted—prior to the due process hearing—that the question of whether K.D. had an SLD was in dispute, it was not one of the enumerated issues to be decided at the due process hearing.

The Plaintiffs contend that J.D. and B.D., parents of K.D., were denied the opportunity to meaningfully participate in the development of K.D.'s IEPs, as required by 20 U.S.C. § 1415(b). They assert that representatives of the Defendant failed to consistently provide updates, failed to consider parental suggestions, refused to accept an outside diagnosis of a learning disability obtained by the parents, and treated the parents dismissively. The Defendant argues the parents were frequently updated, frequently consulted, and extremely involved in K.D.'s educational development. The Defendant notes that K.D.'s IEPs were adjusted on multiple occasions based on parental input. The IHO found that "if any parents of any student with a disability were ever provided an opportunity to participate in the decision making process regarding the provision of a free appropriate public education to their child it would be these." (R. at 5632.) The BSEA upheld the IHO's conclusion. (R. at 5160.)

### C. Substantive Failure to Provide a FAPE

The Plaintiffs argue that K.D.'s IEPs were not appropriate because they were not tailored to his individual needs, and therefore were not likely to produce a meaningful educational benefit and denied him a FAPE. The Plaintiffs contend the IEPs could not have been tailored to address K.D.'s disabilities because the Defendant did not evaluate K.D. and did not appropriately diagnose him with an SLD. The Plaintiffs further argue that although K.D. made some educational progress—eventually meeting the fourth grade standards in Indiana—his overall educational progression was sporadic, sometimes showing regression, and any progress he made was mere token advancement, not representing meaningful educational benefit.

The Defendant argues, as the IHO and the BSEA found, that the IEPs in place were

reasonably calculated to produce meaningful educational benefit, and in fact did produce educational benefit to K.D. The Defendant asserts that K.D. did not have a learning disability, and even if he did, any failure to procedurally identify an SLD did not result in denial of a FAPE because the IEPs addressed K.D.'s specific needs, whether or not those needs were labeled as an SLD.

**D.      Failure to Offer Appropriate Compensatory Services**

The Plaintiffs assert that they are entitled to reimbursement for the costs of K.D.'s private schooling because the IEPs provided by the Defendant were inappropriate (as articulated above), and because K.D.'s placement at the Hyde Park Day School is appropriate. The Defendant argues the Hyde Park Day School is not an appropriate private placement for K.D. because of K.D.'s hearing impairment, and because no teacher at the Hyde Park Day School is licensed to teach hearing impaired students. The IHO found that the appropriateness of the Hyde Park placement was moot because the Defendant had provided a K.D. a FAPE. (R. at 5633.) The BSEA upheld that conclusion of law. (R. at 5160.)

**E.      Deference to the IHO and BSEA Decisions**

Finally, the Plaintiffs assert that the IHO and the BSEA made incorrect determinations that the Defendant provided K.D. a FAPE. They argue that the IHO and BSEA decisions were neither thorough, nor complete, and thus do not deserve deference. They argue that the IHO and BSEA decisions contradict established precedent because the IHO's findings support a conclusion that the Defendant denied K.D. a FAPE, yet the IHO, and the BSEA when it adopted

most of the IHO's findings of fact, found that the Defendant did provide K.D. a FAPE. The Plaintiffs additionally argue that the IHO was biased on behalf of the Defendant, and the BSEA included irrelevant, unprofessional commentary in its decision.

The Defendant argues that the IHO and BSEA decisions deserve significant deference. The Defendant argues the IHO was not biased, and in any case the Plaintiffs waived an opportunity to raise bias by failing to challenge the IHO on the record at the due process hearing. The BSEA found no merit to the Plaintiffs' bias argument. (R. at 5160–61.) The Defendant argues the BSEA decision is appropriate, and that any inappropriate reference in the BSEA decision could have been addressed with a motion to strike by the Plaintiffs. In the absence of such a motion, the Defendant argues the Plaintiffs have waived any argument on the subject.

## DISCUSSION

As articulated above, the Court's review of K.D.'s IEP is twofold. First, the Court must consider whether the procedural requirements of the IDEA have been met. *Rowley*, 458 U.S. at 206. Second, the Court determines whether the IEP was reasonably calculated to enable K.D. to receive educational benefits. *Id*. at 206–07. The Plaintiffs challenge both the procedural and substantive adequacy of the educational programs implemented by the Defendant for K.D. In presenting this challenge, they bear the burden of proving by a preponderance of the evidence that K.D. was denied a FAPE. In addition, the Court must give due weight to the findings of the BSEA.

**A.      Degree of Deference to be Given the IHO and BSEA Decisions**

The Plaintiffs argue that the Court should not give significant deference to the decisions of the IHO and the BSEA because they are not "thorough and complete," and do not represent "carefully reviewed" or "meticulously reviewed" findings. *Nein*, 95 F. Supp. 9d at 965. They point out that the BSEA corrected many of the IHO's findings of fact, and argue that some of the IHO's findings of fact could have been used to support a finding that K.D. was denied a FAPE. They also argue that the BSEA overstepped its authority by amending or deleting certain findings of fact, and that the BSEA's decision contained an improper personal reference to counsel for the Plaintiffs. The Defendant argues the IHO's determinations with respect to a voluminous record are generally accurate and worthy of deference. The Defendant also argues that the BSEA decision—not the IHO's decision—is the decision on review, and that decision is thorough and complete, particularly in light of the Plaintiffs' opportunity to challenge it before the BSEA issued an amended decision that corrected some errors. The Defendant notes that the Plaintiffs did not request that the BSEA delete the reference to Plaintiffs' counsel in its amended decision, and therefore argues the Plaintiffs have waived any argument to strike it.

The Court agrees with the Defendant that the decisions of the IHO and the BSEA deserve high deference because they are thorough and complete. In dealing with an administrative record of more than 5000 pages, minor administrative errors are foreseeable. As the Defendant notes, the BSEA decision is the decision on appeal, and the Plaintiffs have not cited to portions of that decision that are replete with error. The Court also finds that the Plaintiffs have waived opportunity to request that the reference to counsel in the BSEA report be stricken because they did not so request before the BSEA. Whether stricken or not, the Court finds that the reference is irrelevant to the Court's determination whether K.D. received a FAPE. With respect to the IHO's

findings of fact, the Court holds that those findings support the IHO's conclusion that K.D. was provided a FAPE.[12] With respect to the findings of fact deleted or amended by the BSEA, the Court finds the BSEA did not overstep its authority.[13]

## B.      Claims Regarding Procedural Violations of the IDEA

### 1.      *Procedural Failure to Identify/Evaluate*

The IHO found that whether K.D. had an SLD was in dispute. However, he did not list it as one of the issues to be decided at the due process hearing. Neither did the Plaintiffs request that it be decided at that hearing.[14] Consequently, the IHO made no decision on whether the Defendant procedurally failed to properly evaluate K.D., leading to a failure to identify K.D. as a student with an SLD. The BSEA also made no finding on this issue. Accordingly, the Defendant argues that the Plaintiffs have waived any argument on this point by procedural default.

---

[12]Specifically, while finding of fact 81 indicates that "several of the Student's identified deficits were not directly addressed in the Student's IEPs" (R. at 5595), finding of fact 82 clarifies that the services actually provided to K.D. "frequently went beyond those required by the goals stated in his IEPs" and met his individual needs. (*Id.*) Further, as noted above in the discussion of alleged procedural errors, while findings of fact 135–38, 145–49, and 156–61 all indicate the IEP goals were not objectively measurable (R. at 5606–09), the IHO clarifies that all of these goals are made objectively measurable by their accompanying benchmarks. *See Bd. of Educ. of N.Y.C.*, 07-010, 5 ECLPR 63 (New York State Educational Agency Review Officer decision April 2, 2007) (upholding IHO decision that vague IEP goals were made specific and objectively measurable by the short term objectives). Finally, while the IHO's finding of fact 172 notes a lack of progress on "some assessments," the thrust of finding of fact 172 is the overwhelming progress indicated by various norm-referenced assessments over the years. (R. at 5612.)

[13]Specifically, the Court finds that the BSEA did not overstep its authority by deleting finding of fact 97 as unsupported by the evidence, particularly where findings of fact 98 and 99 capture the IHO's impression of the special education teacher from finding of fact 97. The Court also finds that the BSEA appropriately modified finding of fact 171 to more accurately describe the means by which the Defendant monitored progress on IEP goals.

[14]Under 511 Ind. Admin. Code 7-45-4(d), the Plaintiffs had an opportunity to amend the due process request either through consent of the Defendant or permission of the IHO.

The Court agrees with the Defendant that by failing to raise it at the lower administrative levels the Plaintiffs have waived argument as to the procedural failure to properly evaluate K.D. or identify K.D. as a student with an SLD. However, the Court believes an analysis of the arguments relating to K.D.'s purported SLD will go to the heart of the substantive question of whether K.D. was denied a FAPE. *See M.B. v. Hamilton Se. Sch.*, No. 1-09-cv-0304-TWP-TAB, 2010 WL 3168666, at *5 (S.D. Ind. Aug. 10, 2010) ("[T]he more important question is whether the school district provided a FAPE—not whether it complied with the procedural requirements of the IDEA."). The Court will therefore consider this point in the context of its substantive—not procedural—analysis.[15]

### 2. *Procedural Failure to Allow for Meaningful Parental Participation*

The IHO found that:

> if any parents of any student with a disability were ever provided an opportunity to participate in the decision making process regarding the provision of a free appropriate public education to their child it would be these.

(R. at 5632.) The IHO noted that CCC meetings were held at the parents' request, that K.D.'s teachers contacted K.D.'s parents regarding his work on multiple occasions, that the Defendant sought and paid for outside evaluations at the request of K.D.'s parents, and that the CCC added goals and services to K.D.'s IEPs as a result of his parents' suggestions. (R. at 5630–32.) Furthermore, insofar as there were procedural errors, the IHO held that "none [of the procedural errors] individually or collectively impeded the child's right to a free appropriate public

_____

[15]Similarly, the Plaintiffs argue that the Defendant should have conducted a Functional Behavioral Assessment (FBA) of K.D. and implemented a Behavioral Intervention Plan (BIP). Because this was not an issue before the IHO or the BSEA, the Court will consider it only with respect to the substantive IDEA analysis.

education to any degree that resulted in a cumulative adverse effect on the education received by the Student." (R. at 5632.) The BSEA upheld the IHO's conclusions of law. (R. at 5160.)

The IDEA requires that parents of a child with a disability be given opportunity to examine all records, meaningfully participate in the formation of IEPs, obtain an independent educational evaluation of the child, receive written notification of proposed changes to IEPs, demand mediation, or demand due process. 20 U.S.C. § 1415(b). The Ninth Circuit has observed that "those procedures which provide for meaningful parent participation are particularly important." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001). As noted above, procedural flaws do not automatically require a finding of a denial of a FAPE. *Heather S.*, 125 F.3d at 1059. Only those procedural flaws that result in loss of educational opportunity can be held to deny a student a FAPE. *Id.*

The Court agrees with the IHO and the BSEA that K.D.'s parents were not denied opportunity to meaningfully participate in the formation of his IEPs. CCC meetings were scheduled to comply with the parents' needs. The Defendant sought evaluations of K.D. at his parents' request. Both the April 2009 and the March 2010 IEPs were adjusted based on K.D.'s parents' suggestions. Meetings were set to accommodate the parents' schedules and to discuss new data provided by and at the request of the parents. The transcripts from the CCC meetings reveal that representatives of the Defendant listened to the parents' repeated concerns, made adjustments to the IEPs where appropriate, and provided the parents every opportunity for meaningful input. The parents do not allege that they were denied opportunity to attend every CCC meeting,[16] nor were they denied opportunity to present their recommendations and

---

[16]The CCC met on April 1, 2009, because the IEP was expiring, and due to a scheduling conflict K.D.'s mother was unable to be present in person, but attended by telephone.

requests, or comment on the committee's recommendations. It is true the CCC did not agree with the parents' suggestions where Dr. Erenberg was concerned, but a showing that the CCC did not always agree with the parents is no proof that the parents were denied meaningful opportunity to participate. As the IHO held, "[t]he School considered the suggestions provided by the Student's parent(s) as it developed this IEP. Did the School implement every suggestion or recommendation made by the Student's parents? No. Neither was the school required to do so." (R. at 5629.) The BSEA upheld this conclusion of law, and, giving due deference to the BSEA's holding, the Court finds that the Defendant did not deny K.D.'s parents meaningful participation in the IEP process. Further, the Court finds that even if there were procedural errors[17]—such as a procedural failure to timely provide status updates—any such error was harmless and did not have the effect of substantively denying educational opportunity to K.D., denying his parents the opportunity to be meaningfully involved, or denying K.D. a FAPE.

### 3. *Procedural Failure to Provide Measurable IEP Goals*

The Plaintiffs argue that K.D.'s IEP goals were not measurable, as required by the IDEA and Indiana law. 20 U.S.C. § 1414(d)(1)(A)(i)(II); 511 Ind. Admin. Code 7-42-6(f)(2)(A). Indeed, the IHO found that the IEP goals were not objectively measurable (R. at 5606–09), but clarified that all of these goals were made objectively measurable by their accompanying benchmarks. *See Bd. of Educ. of N.Y.C.*, 5 ECLPR 63 (upholding IHO decision that otherwise

---

[17]The IHO did not identify which procedural errors he believed the Defendant had committed, (R. at 5632), though in context he appears to be referencing incidental failures to provide materials specified in the IEPs (R. at 5630–31), and minor, occasional deviations in IEP services which were timely corrected (R. at 5631), neither of which impeded K.D.'s parents from being involved, nor caused a deprivation of educational benefit, nor denied K.D. a FAPE.

vague IEP goals were made specific and objectively measurable by the short term objectives). The Plaintiffs argue the benchmarks for K.D.'s goals were not logical breakdowns of the goals, and thus did not have the effect of making otherwise unmeasurable goals into objectively measurable goals. The Defendant argues that the goals and benchmarks taken together would allow someone unfamiliar with K.D.'s IEPs to implement them and assess his progress. The Court finds that the benchmarks were logical breakdowns providing objectively measurable criteria for evaluating goal completion, and finds that the Plaintiffs have not shown by a preponderance of the evidence that the goals taken together with the benchmarks were procedurally deficient under the IDEA.[18]

### 4.      *Procedural Failure to Consider Placement in the Least Restrictive Environment*

The Plaintiffs argue the Defendant refused to consider any placement option for K.D. besides his local school. They argue that because no person at the CCC meetings had the authority to allocate funds for a private school placement,[19] the Defendant must not have considered all placement options. The Defendant argues, and the Court agrees, that there is no requirement for an individual present at the CCC meeting to be invested with the authority to fund private school placement. Rather, the Defendant is required to consider the full continuum of placement options. As the Defendant notes, the CCC considered the parents' request to place K.D. at the Hyde Park Day School—and rejected that request. The CCC determined that the least

---

[18]The Court notes, further, that the Plaintiffs' argument that some benchmarks are wholly unrelated to goals is undeveloped in the briefs before the Court. The Court will not sift the record for arguments the Plaintiffs made before the BSEA but did not make to this Court.

[19]Evidently such a placement would have to be approved by the school board, no member of which was present at the CCC meetings.

restrictive environment in which K.D.'s educational needs could be met was his local school (R. at 4858–59), with some accommodations, such as reading instruction in the resource room. The Plaintiffs have not shown by a preponderance of the evidence that the Defendant failed to consider all options.

## C.    Claims Regarding Substantive Failure to Provide a FAPE

Having determined that the Plaintiffs have not proven by a preponderance of the evidence that the Defendants violated the procedural requirements of the IDEA, the Court now considers the second prong of the *Rowley* analysis, specifically whether K.D.'s IEPs were reasonably calculated to provide some educational benefit. *See Rowley*, 458 U.S. at 206–07. An IEP is substantively adequate so long as it responds to "all significant facets of the student's disability, both academic and behavioral." *Alex R.*, 375 F.3d at 613. In other words, to be substantively appropriate, an IEP must be "likely to produce progress, not regression or trivial educational advancement." *Id.* at 615 (quotation marks omitted). *Cf. Berns*, 2011 WL 6644068, at *9 ("To prevail on their substantive claim, then, [the plaintiffs] must convince this court that the hearing officer, the Board, and the district court clearly erred in determining that [the student] was making progress under his IEP."); *Nein*, 95 F. Supp. 2d at 975 ("merely trivial or minimal progress is not sufficient"). Meaningful educational benefit must be "gauged in relation to the potential of the child at issue." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004). The IHO found that "the preponderance of the testimony, as supported by documents and exhibits provided at the hearing, demonstrate that the Student has received meaningful and measurable benefit from the services provided by the School." (R. at 5633.) The BSEA upheld

that conclusion of law. (R. at 5160.)

Because the Court determines the IEPs were likely to produce—and indeed, did produce—progress, the Court finds that the IEPs were substantively adequate and finds that the Plaintiffs have not shown by a preponderance of the evidence that K.D. was denied a FAPE. The Court will address each of the Plaintiffs' arguments as to the substantive inadequacy of K.D.'s IEPs.

1.    *Substantive Failure to Tailor IEPs to K.D.'s Unique Needs*

The Plaintiffs argue, as articulated above, that the Defendant's failure to properly evaluate K.D. resulted in IEPs which did not address his specific needs. In effect, the Plaintiffs argue that any IEP not contemplating an SLD when K.D. did in fact have an SLD could not have been "tailored to the unique needs" of K.D., *Rowley*, 458 U.S. at 181, in order to provide meaningful educational benefit, and thus must have denied K.D. a FAPE. The Defendant argues that K.D. did not have an SLD, and even if K.D. exhibited characteristics consistent with an SLD, the IEPs met K.D.'s specific needs—whether or not called an SLD—and thus were tailored to help K.D. achieve meaningful educational progress and to provide him a FAPE.

The Plaintiffs have presented compelling evidence that the Defendant failed to evaluate K.D. for an SLD. He was due for a triennial educational evaluation in April 2009, but the Defendant declined to evaluate him because no services were being added or taken away, despite K.D.'s parents asking that he be evaluated in February 2007, April 2008, and April 2009. The Plaintiffs have also shown that representatives of the Defendant understood K.D.'s problems to be deeper than his hearing impairment. In 2007, the Indiana School for the Deaf evaluation noted

the possibility that K.D. had Attention Deficit Hyperactivity Disorder, and that his attention issues were not related to his hearing impairment. The April 2008 IEP noted K.D.'s difficulty staying focused, and his problems with reading. The June 2008 Indiana School for the Deaf evaluation noted attention issues, characteristics of an educationally-significant learning disability, and a slow rate of learning in reading comprehension. In the October and November 2008 CCC meetings, K.D.'s teachers acknowledged his problems with focus and reading, and in an email after those meetings, his teacher of record stated she did not believe his problems were hearing related. The April 2009 IEP noted that K.D.'s immaturity was affecting his ability to stay on task. Finally, Dr. Erenberg's report and February 2010 meeting with the CCC put the Defendant on official notice of her determination that K.D. had an SLD in addition to a hearing impairment. The Defendant responded to Dr. Erenberg's report not by diagnosing an SLD or by referring K.D. for more thorough educational evaluation. Instead, the Defendant offered to substantially boost K.D.'s weekly hours with the special education teacher, and offered a new set of IEP goals to meet what the Defendant considered to be his needs. The Plaintiffs argue that the Defendant's refusal to comply with Dr. Erenberg's diagnosis and recommendations resulted in a March 2010 IEP not calculated to provide K.D. with meaningful educational benefit. The Plaintiffs also offer an undeveloped argument that K.D.'s behavior was impeding his learning, thus the Defendant should have conducted an FBA and a corresponding BIP, and failure to conduct such an assessment/intervention resulted in IEPs not tailored to provide meaningful educational benefit.

The Plaintiffs argue that prior cases have held that IEPs cannot be tailored to provide meaningful educational benefit if the CCC does not know about the student's SLD. In *Amanda J.*

*v. Clark County School District*, 267 F.3d 877 (9th Cir. 2001), the court held that the student had been denied a FAPE because the school district did not provide her parents with the results of an educational evaluation suggesting she was autistic. Because her parents were therefore unable to zealously advocate before the CCC for IEP goals that would address their daughter's autism, the court stated that "[t]he IEP team could not create an IEP that addressed Amanda's special needs as an autistic child without knowing that Amanda was autistic." *Id.* at 894. The Court finds that *Amanda J.* is distinguishable on its facts. While the parents in *Amanda J.* did not know about the potential autism diagnosis, nothing in that case indicates that the CCC did not have access to that information.[20] Thus, the Ninth Circuit's decision turned on the lack of parental involvement in development of IEPs when the parents did not have key information relating to their daughter's educational evaluation. As previously discussed, the Defendant fully disclosed its information and its strategies to K.D.'s parents, who consequently zealously advocated for K.D. before the CCC.

The Plaintiffs also argue the case of *Flowers v. Martinez Unified School District*, 19 IDELR 898 (N.D. Cal. 1998), where the district court denied a school district's motion for summary judgment on grounds that a triable issue of material fact existed as to why the school district had refused to accept the parents' private evaluation of the student, an evaluation which had diagnosed the student as dyslexic, and as to why the school district had refused to alter the student's IEP after receiving the diagnosis of dyslexia from the independent evaluation. *Id.* at

---

[20]Indeed, while not addressed in the opinion itself, the Appellant's Brief states that a member of the IEP team reviewed the report that suggested the child was autistic prior to the CCC meeting where the IEP was developed. (Appellant's Opening Br., *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001) (No. 99-17157), 1999 WL 33607186, at *5.) The appellee in its brief did not deny this, essentially arguing that the IEP team would have known about the possible autism and that it would have informed the parents. (Appellee Clark Cty. Sch. Dist.'s Resp. Br., 1999 WL 33977141, at *7.)

900. The *Flowers* court concluded that "[w]ithout an appropriate diagnosis of [the student]'s special needs, there could be no formulation of an IEP that would address those special needs." *Id.* The Court notes that *Flowers* is also distinguishable—both factually and procedurally. While the CCC in *Flowers* apparently refused to modify the IEP based on the independent diagnosis, K.D.'s CCC agreed to make changes to the IEP goals and services provided based on Dr. Erenberg's report.[21] Furthermore, the *Flowers* court apparently took for granted that the independent diagnosis of dyslexia was correct, while the Defendant's subsequent evaluation of K.D. did not conclude that he had an SLD, which at least raises a question about whether Dr. Erenberg's diagnosis was correct. Moreover, the record indicates that the kind of educational program recommended by Dr. Erenberg—a highly-structured, multisensory education—was already being provided by K.D.'s teachers in the fourth grade, and would in the opinion of K.D.'s teachers also be provided by the Defendant's fifth grade educational program. (R. at 972–73.) Finally, *Flowers* is procedurally distinguishable because the court did not grant summary judgment on behalf of the plaintiffs. Rather, the court denied summary judgment to the school district and ordered that the case continue. The Plaintiffs do not aver that the *Flowers* court ultimately held that the student had been denied a FAPE.[22]

---

[21]The March 2010 IEP increased K.D.'s special education services from 2.5 hours per week to 6 hours per week. The Plaintiffs argue he was already receiving more than 2.5 hours per week (R. at 964), and, indeed, the record indicates he was being given 4 hours per week, not 2.5 hours. But the increase from 4 hours per week to 6 hours per week still indicates a significant effort by the Defendant to respond to the concerns raised by Dr. Erenberg's report.

[22]The Court additionally distinguishes two more cases cited by the Plaintiffs on this point. First, in *Evans v. Board of Education of Rhinebeck Central School District*, 24 IDELR 338, 345 (S.D.N.Y. 1996), the court found that the IEP did not adequately reflect the student's deficits because it was based on "broad score[s]" instead of specific evaluations. The Court distinguishes *Evans* on its facts because K.D. was evaluated and tested by many different methods and nothing in the record indicates the CCC was unaware of his previous evaluation or test results. Second, in *Friedman v. Vance*, 24 IDELR 654, 657 (D. Md. 1996), the court found that the student "deserved the diagnosis learning disabled" and therefore

The Plaintiffs additionally point to the case of *Kirby v. Cabell County Board of Education*, Nos. 3:05-0322, 3:03-0320, 2006 WL 2691435 (S.D. W.Va. Sept. 19, 2006), where the district court overturned the IHO's finding that the student had received a FAPE. In holding that the student had received a FAPE, the IHO ordered "additional testing . . . through objective, standardized, tests" to determine whether the student's consistent advancement through the grades represented real or merely token academic progress. *Id.* at *8–9. The district court held that the IHO's decision to uphold the IEP while simultaneously ordering additional testing was "flawed" because the IEP's failure to assess the student's academic level "goes to the heart of the IEP." *Id.* at *8. "Without a clear identification of [the student]'s present levels, the IEP cannot set measurable goals, evaluate the child's progress, and determine which educational and related services are needed." *Id.* The Plaintiffs argue that just as the IHO in *Kirby* could not properly approve the IEP where proper academic assessment was lacking, so the IHO could not properly approve K.D.'s IEPs at the time of the due process hearing when the IHO ordered that the CCC continue to monitor and evaluate K.D. for the presence of an SLD after the hearing. (*See* R. at 5634.) The Court declines to extend the reasoning from *Kirby* so far. Certainly where the *Kirby* IHO's decision to order additional testing revealed that the *Kirby* IHO had no basis for approving the IEP because the IHO did not know whether the student's advancement from grade to grade actually represented educational progress, the IHO was wrong to approve the IEP. But

the IEP which did not contemplate such a diagnosis was inadequate under the IDEA. The Court makes no such finding concerning K.D. As articulated below, while it is clear that K.D. exhibits some characteristics consistent with an SLD diagnosis, that diagnosis was not established before the IHO. Further, as outlined below, the Court finds that K.D.'s IEPs met his specific needs. The Court additionally distinguishes *Friedman* because that court heard the evidence in a bench trial and had the opportunity to weigh the in-person testimony. By contrast, the parties have agreed this matter is ripe for decision on summary judgment without supplementing the administrative record.

K.D.'s case is different. Here the IHO (and the BSEA) already had an extensive record of "objective, standardized tests" upon which to base his determinations that K.D.'s IEPs were tailored to provide him meaningful educational benefit. That the IHO ordered K.D. to be continually evaluated and monitored for the presence of an SLD does not signal that the IHO's reasoning was "flawed" as in *Kirby* unless the IHO had no basis upon which to measure the propriety of the IEPs apart from the further evaluation and monitoring. K.D.'s IHO had before him a bevy of evaluations of K.D. through the years including educational evaluations by a variety of professionals and objective test results. His order to continually monitor K.D.'s progress after the due process hearing does not undermine the basis for the IHO's decision at the time of the hearing. Rather, the IHO's decision was based on the substantial information in the record concerning K.D.'s academic level.

The Defendant argues that K.D. did not have an SLD at all. Even Dr. Erenberg noted in her evaluation of K.D. that a diagnosis of hearing impairment normally excludes the possibility of an SLD diagnosis. The Defendant's school psychologist testified at the due process hearing that an SLD analysis includes gauging progress in the general education curriculum and other specific interventions (R. at 4828), that an SLD diagnosis requires weakness in educational performance (R. at 4849), and that her May 2010 evaluation of K.D. was inconclusive on the question of whether he had an SLD. (R. at 4848, 4861.) She added that she observed weaknesses in processing speed not normally associated with hearing impairment, which could indicate an SLD, but could also stem from attention issues. (R. at 4849, 4861.) One of the Plaintiffs' witnesses testified that a student with an SLD would not typically pass the ISTEP+. (R. at 3338.) K.D. passed all portions of the ISTEP+ in the spring of 2010.

The Defendant argues, further, that no matter whether K.D.'s status is labeled an SLD or is labeled problems with focus, attention, and cognition, the IEPs were tailored to meet K.D.'s specific needs. As the Seventh Circuit stated in *Heather S.*, "whether [the student] was described as cognitively disabled, other health disabled, or learning disabled is all beside the point. The IDEA concerns itself not with labels, but with whether the student is receiving a free and appropriate education." 125 F.3d at 1055. When "the school is dealing with a child with several disabilities, the combination of which . . . make [the student's] condition unique," the IDEA "charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the student's] multiple disabilities." *Id.*; *cf. Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002). As the Eighth Circuit recently held, "the particular disability diagnosis affixed to a child in an IEP will, in many cases, be substantively immaterial because the IEP will be tailored to the child's specific needs." *Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1004 (8th Cir. 2011). "[T]he party challenging the IEP must show that the failure to include a proper disability diagnosis compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Id.* (quotation marks omitted). The Defendant argues that the IEPs were tailored to meet K.D.'s particular needs, no matter what K.D.'s SLD diagnosis.

The Court agrees with the Defendant that the Plaintiffs have not shown how any failure to properly evaluate K.D., and consequent failure to identify K.D. as a student with an SLD, resulted in denial of a FAPE. The Plaintiffs have shown that the Defendant did not perform an exhaustive educational evaluation of K.D. until the pendency of the due process hearing, and that

multiple evaluations and indications in the record had suggested the possibility that K.D. had an SLD. The Plaintiffs have suggested—though not conclusively—that K.D. actually had an SLD in addition to his hearing impairment. But the Plaintiffs' argument cuts against their case. The Plaintiffs argue that the Defendant had extensive notice of K.D.'s cognitive deficits and should have evaluated him for an SLD. But the extensive notice that K.D.'s teachers received served to ensure that the IEPs they crafted were tailored to his cognitive deficits. The record shows that representatives of the Defendant were well aware of K.D.'s problems and the ways in which they did or did not relate to his hearing impairment. They consequently tailored IEPs to meet those problems. Thus, the very evidence in the record which the Plaintiffs argue should have triggered an evaluation actually served to ensure that K.D.'s IEPs were reasonably likely to confer meaningful educational benefit.

As to the Plaintiffs' argument that an FBA and a BIP were necessary, and lack of an FBA/BIP resulted in deficient IEPs, the Court finds the Plaintiffs have not met the standard of proving an IDEA violation by a preponderance of the evidence. An FBA/BIP could be warranted when a disabled student exhibits behavior that impedes the learning of himself or others. *Alex R.*, 375 F.3d at 614. The IDEA does not use the term "behavioral intervention plan" in § 1414(d)(3)(B)(i), but this section does require that a school district's IEP team, "in the case of a child whose behavior impedes the child's learning or that of others, *consider* the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added); *Alex R.*, 375 F.3d at 614. Here, no evidence suggests K.D.'s behavior interfered with the learning of other students. As to his own learning, the evidence does not suggest that the Defendant ignored his behavioral issues and failed to consider

strategies to address the behavior. On the contrary, K.D.'s IEPs indicate that his behavior was not an issue. (R. at 335, 348, 362, 374, 385, 403, 424.) Transcripts from CCC meetings indicate K.D.'s focus and attention were issues contemplated by his IEPs. The Plaintiffs have not established that the Defendant failed to consider the use of positive behavioral interventions and supports to address K.D.'s needs. Indeed, the April 2009 IEP indicates that a BIP is not necessary, but also implements a strategy to minimize auditory distractions in order to increase on task behavior. (R. at 374.) The mere absence of a BIP is not evidence that the CCC did not "consider" strategies to address K.D.'s behavior, which is all the statute requires. The IDEA does not set forth any substantive requirements for a BIP. *See Alex R.*, 375 F.3d at 615. There is ample evidence in the record to suggest that the CCC considered K.D.'s behavior in developing his IEPs.

Further, the Court's examination of the IEP goals and accommodations from 2008 to 2010 indicates that they address K.D.'s "unique needs." *Rowley*, 458 U.S. at 188. The IEPs include goals and benchmarks addressing writing, spelling, reading comprehension and fluency, memory and cognitive functioning, problem solving, and speech articulation. The IEPs include accommodations for K.D.'s attention and focus issues, and the April 2009 IEP includes a behavioral intervention strategy to address K.D.'s distraction. The Plaintiffs argue that the IEPs did not address K.D.'s problems with peer relations, as noted in Dr. Erenberg's report. (R. at 498.) But the teachers who dealt with K.D. on a regular basis did not observe K.D. being harassed or rejected by his peers. (R. at 3532, 3561.) On the contrary, his teachers testified that other students were accepting of K.D. and brought him into discussions (R. at 3955–56), that he engaged normally with other students (R. at 4812–13), and that on occasion K.D. gave assistance

to other students. (R. at 4845.) The Court agrees with the Defendant that it was not required to defer to the opinion of Dr. Erenberg when the teachers who observed K.D. saw no problems with social interaction. *See Berns*, 2011 WL 6644068, at *10 ("[I]t is inappropriate to defer to the opinion of a single psychologist, particularly where that opinion is in conflict with the opinions of 'teachers and other professionals.'") (quoting *Heather S.*, 125 F.3d at 1057). The Plaintiffs argue that many of K.D.'s goals and benchmarks are similar to those articulated in the Indiana Academic Standards. But as the Defendant notes, Article 7 requires that IEPs be designed to enable the student to progress in the general educational curriculum, 511 Ind. Admin. Code 7-42-6(f)(2)(A)(i), so the question is not whether the IEPs resembled the State's standards, but whether or not they addressed K.D.'s individual needs. The Court determines, as the IHO stated concerning all the IEPs at issue, that "[w]hile [the IEPs] did not directly address every possible 'need' of the Student, the primary needs of the Student, as related to the Student's disabilities, were adequately addressed by the objectives, benchmarks and other supplemental and supportive sections of th[e] IEP[s], including conference notes and other supplemental sections of the IEP[s] with such sufficiency as to be reasonably calculated to provide educational benefit." (R. at 5616.)

The Plaintiffs fail to show that the Defendant should have provided K.D. a more meaningful educational benefit under the IDEA. Dr. Erenberg recommended the IEP include a diagnosis of an SLD, but that diagnosis was challenged by the Defendant's subsequent evaluation which did not result in an SLD diagnosis. Dr. Erenberg further recommended placement at the Hyde Park Day School, but the Defendant's duty to comply with that recommendation assumes the legal conclusion that K.D. was being denied a FAPE in his present

educational placement. Finally, Dr. Erenberg recommended a highly-structured, multisensory education for K.D., but that is exactly what K.D.'s teachers testified they were already providing as they worked to implement his IEP. (*See* R. at 2984–85, 2997, 3003, 3019, 3577, 4320, 4766, 4772.) The CCC added IEP goals suggested by K.D.'s parents. As to the parents' requests for one-on-one tutoring, the Defendant argued such attention was not necessary since K.D. was already making adequate progress. Similarly, the parents requested extended school year services for K.D., but the Defendant offered only the general education summer school program because it believed this was sufficient to address K.D.'s needs. (R. at 3154, 3157.) K.D.'s parents—quite naturally—want the very best for their child, and argue that the Defendant should have taken further steps so that K.D. made even more progress. But the IDEA does not require the Defendant to provide K.D. with an educational experience that maximizes his potential. *Todd*, 299 F.3d at 905 ("The school district . . . is not required to provide the best possible education."); *M.B.*, 2010 WL 3168666, at *6 ("Arguably *any* student—disabled or not—benefits academically by receiving repetitive instruction and attending more hours of school. However, given the reality of limited resources, [the IDEA does] not require a school to devote limitless resources to take a disabled child to the height of his potential."). Instead, under the IDEA, the Defendant must ensure that IEPs are "reasonably calculated to enable the child to receive an educational benefit." *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004). The Court finds that K.D.'s IEPs were reasonably calculated to provide educational benefit.

The Plaintiffs argue that the CCC effectively "took no action" on K.D.'s IEPs despite his lack of progress. *See T.H. v. D.C.*, 620 F. Supp. 2d 86, 89–90 (D.D.C. 2009) (court found no

denial of a FAPE where CCC changed IEPs in response to student's lack of progress). In support, the Plaintiffs note that no changes were made to the April 2008 IEP after the October/November 2008 CCC meetings, that the April 2009 IEP decreased certain services, and that Dr. Erenberg opined that the March 2010 IEP was not appropriate. The Court is not persuaded that the CCC "took no action" where it supplemented the April 2009 and March 2010 IEPs to respond to K.D.'s parents' concerns, and where CCC members were aware of K.D.'s gradual progress and his cognitive and attention difficulties. Furthermore, the Plaintiffs' contention that K.D. made no progress over the period in question is unsupported by the record.

### 2.     *K.D.'s Academic Progress*

K.D.'s demonstrable progress over the course of the two year period prior to the Plaintiffs' due process demand illustrates that the IEPs were not only likely to confer meaningful educational benefit—they actually conferred educational benefit on K.D. As the Seventh Circuit stated in *Berns*, "[t]o prevail on their substantive claim . . . [the plaintiffs] must convince this court that the hearing officer [and] the Board . . . clearly erred in determining that [the student] was making progress under his IEP." 2011 WL 6644068, at *9. As in *Berns*, the IHO and the BSEA both concluded that K.D. was making progress under his IEP, and the Plaintiffs have not convinced the Court by a preponderance of the evidence that the IHO and the BSEA clearly erred in that determination. Although K.D. had to repeat the fourth grade, and although he demonstrated academic deficiencies, his deficiencies did not define his educational experience. *See, e.g., M.P. v. Poway Unified Sch. Dist.*, No. 09 CV 1627 JLS (NLS), 2010 WL 2735759, at *11 (S.D. Cal. July 12, 2010) (Although the student "did not meet all his goals or reach the level

of an average, proficient student according to the testing [and] his report card . . . [t]hat . . . does not indicate that meaningful progress was not made.") (quotation marks omitted).

As recounted above, the record demonstrates that K.D. made academic progress.[23] His test results on star math and star reading, in addition to Acuity test scores on math, language arts, and science, all indicate academic progress from 2008 to 2010. His accelerated reader scores also indicate his reading level increased from 2009 to 2010. His teachers and others who have evaluated him testified at the due process hearing and in CCC meetings to the progress he was making in various areas. Further, his English/Language Arts score on the ISTEP+ from fall 2008 to spring 2010 increased from 354 (failing) to 381 (failing) to 445 (passing). And his Mathematics score on the ISTEP+ over the same period increased from 407 (failing) to 456 (passing) to 473 (passing again). As the ISTEP+ is the test used by the State of Indiana to determine whether students have met academic standards for their grade, the Court finds K.D.'s achievement to be significant evidence of his educational progress.[24] K.D.'s IEPs were not just

---

[23]Concerning the rate of K.D.'s progress, the Plaintiffs frequently argue that K.D. has average intelligence, and thus should make average progress. First, the Court notes, as articulated above, that the Defendant was not required to maximize K.D.'s potential. *M.B.*, 2010 WL 3168666, at *6. But the Court finds, further, that over the course of the two years in question, the Plaintiffs have not shown by a preponderance of the evidence that K.D.'s progress was incommensurate with his potential as a student with average intelligence and significant disabilities.

[24]Although K.D.'s scores on the Woodcock-Johnson III test did not indicate progress, the Court notes that the Defendant avers the Woodcock Johnson III test is "normed based on age." (Def.'s Br. Opp'n 35, ECF No. 25.) The Plaintiffs do not challenge this assertion. Based on this understanding, the Court does not find K.D.'s lack of progress on this test to be dispositive where he was being compared to other students his age who had not been held back a year.

The Defendant also asserts—and the Plaintiffs do not challenge—that approximately 25% of students in the Defendant school corporation fail the ISTEP+. Thus, passing all sections of the ISTEP+ is a meaningful educational step. The Plaintiffs argue that K.D.'s progress is token progress only. *See Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 631, 636 (4th Cir. 1985) (student with "high IQ" who was "functionally illiterate" was denied a FAPE in spite of grade advancement); *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564, 584 (W.D. Va. 2010) (consistent grade promotion described as "token advancement" and "a sad case of social promotion"). No evidence before the Court suggests that the

tailored to provide him with meaningful educational benefit. In fact, K.D. was making educational progress under his IEPs and was ready to proceed to the fifth grade when his parents decided to enroll him in a private school.

The Court finds that, giving due deference to the BSEA decision, the Plaintiffs have not shown by a preponderance of the evidence that the IHO and BSEA were wrong in determining that K.D. was making progress under his IEPs. Thus K.D. was provided a FAPE, and the Plaintiffs' substantive challenge under the IDEA must fail.

### D. Propriety of Private School Placement

Because he determined that the Defendant did not deny K.D. a FAPE, the IHO did not reach the issue of whether placement at the Hyde Park Day School was appropriate (R. at 5633), and the BSEA upheld that conclusion of law. (R. at 5160.)

K.D.'s parents argue that because K.D.'s IEPs are not appropriate, they are entitled to reimbursement for the costs of enrolling K.D. in the Hyde Park Day School as an appropriate private placement. Reimbursement of private school placement expenses is authorized when "a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *Todd*, 299 F.3d at 905. In deciding whether a private school

---

Defendant had a "policy of social promotion," *Hall*, 774 F.2d at 636, and the Defendant's unchallenged assertion that only 75% of students pass the ISTEP+ suggests that just the opposite is true. Thus, K.D.'s advancement was more than token progress.

Finally, the Plaintiffs argue that K.D.'s speech services did not change although he did not progress in articulation of the /s/, /sh/, and /z/ sounds. The Court is satisfied with the testimony from K.D.'s speech/language pathologist that this difficulty is likely to continue due to K.D.'s hearing impairment (R. at 4427–28, 4439–40), and in any case failure to progress on a single goal is not by itself evidence of denial of a FAPE. *See Poway*, 2010 WL 2735759, at *11.

placement is proper, a court must determine "that it is appropriate and not that it is perfect." *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999). The Defendant argues the Hyde Park Day School placement is inappropriate because no teacher there is certified to teach the hearing impaired, and all agree K.D. suffers from hearing impairment. *See R.C. v. Bd. of Educ. of the Hyde Park Cent. Sch. Dist.*, No. 07 CIV 2806 (KMK)(MDF), 2008 U.S. Dist. LEXIS 113149, at *33–34 (S.D.N.Y. Mar. 6, 2008) (tuition reimbursement for private placement denied where parents did not meet burden to show how private school met the special needs of the student). The Plaintiffs have a burden to show that placement at Hyde Park Day School is appropriate. *Berns*, 2011 WL 6644068, at *11. The Court need not reach the issue of whether placement at the Hyde Park Day School was appropriate because the Court has already determined that the Plaintiffs have failed to show that the IEPs violated the IDEA. Nevertheless, the Court notes that the Plaintiffs do not respond to the Defendant's contention that Hyde Park is an inappropriate placement because no teacher there is certified to teach the hearing impaired. Thus, the Plaintiffs have not met their burden to demonstrate the propriety of the Hyde Park placement.

## E.     Attorney's Fees

The IDEA authorizes the court to award reasonable attorney's fees as part of the costs "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). In their Complaint, and in their Motion for Summary Judgment, the Plaintiffs request attorney's fees. Because the Plaintiffs are not a prevailing party they are not entitled to attorney's fees.

**CONCLUSION**

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment [ECF No. 16] is

DENIED and the Defendant's Cross Motion for Summary Judgment [ECF No. 24] is

GRANTED. Judgment will be entered in favor of the Defendant and against the Plaintiffs.

SO ORDERED on February 24, 2012.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION